J-S25007-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
:                     PENNSYLVANIA
:
v.                                       :
:
:
:
RUBEN CEZAIRE                            :
:
Appellant              :      No. 995 EDA 2019

Appeal from the Order Entered March 18, 2019
In the Court of Common Pleas of Montgomery County Criminal Division
at No(s): CP-46-CR-0007774-2017

BEFORE: BENDER, P.J.E., McLAUGHLIN, J., and PELLEGRINI, J.[*]

MEMORANDUM BY BENDER, P.J.E.:          **FILED SEPTEMBER 01, 2021**

Appellant, Ruben Cezaire, appeals from the judgment of sentence of an aggregate term of 2½ to 10 years' incarceration, plus court costs in the amount of $885.00, imposed after he was convicted, following a non-jury trial, of burglary, attempted burglary, criminal trespass, and other related offenses.[1]  On appeal, Appellant challenges the sufficiency of the evidence to sustain his burglary and attempted burglary convictions, as well as the legality of the court's imposition of costs without first considering his ability to pay.

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] We note that our disposition of Appellant's appeal was delayed due to our issuing a stay of his case pending our *en banc* decisions in ***Commonwealth v. Lopez***, 248 A.3d 589 (Pa. Super. 2021) (*en banc*), and ***Commonwealth v. Gary-Ravenell***, 241 A.3d 460 (Pa. 2020) (*en banc*) (unpublished memorandum).

After careful review, we reverse Appellant's burglary and attempted burglary convictions, vacate his judgment of sentence, and remand for resentencing.

The trial court summarized the facts and procedural history of this case, as follows:

> On October 28, 2017, around 9:00 to 10:00 p.m., John Bennett of 310 East Moreland Avenue, Hatboro, was cleaning his kitchen when he heard a thumping on his door. Mr. [] Bennett tried to ignore the thumping, but then someone started breaking into his home. Afraid that the door would break, he opened it. [Appellant], a stranger to Mr. Bennett, ran right by him into his home and made his way upstairs. [Appellant] said he was looking for his brother. Mr. Bennett told [Appellant] to get out of his house. After [Appellant] came back downstairs and disappeared, Mr. [] Bennett went into his brother's room and told him to call the police. He then went back to his front door[] because he was looking for [Appellant]. [Appellant] tried to come back into the home through the front door a second time. [Appellant] grabbed Mr. [] Bennett by the bottom of his shirt and ripped it. Mr. [] Bennett would not let [Appellant] into his home. At some point, [Appellant] pushed Mr. [] Bennett backwards to the ground, and ran back into the home, down to the basement and out the back of the house. Mr. [] Bennett then observed that [Appellant] had gone across the street.
>
> Mr. Bennett's brother, Steven Bennett, called 911. When [Appellant] saw [Steven] Bennett calling 911, he forcefully took the phone from him. [Steven] Bennett went back into his bedroom and used the land line to call 911.
>
> Next to testify at trial was Jarrett Yeager, the resident at 307 East Moreland Avenue. He had seen the commotion across from his residence at 310 East Moreland Avenue and that [Appellant] had forced himself into the Bennett home. He called 911. At some point, [Appellant] started coming over to Mr. Yeager's home. Mr. Yeager secured his wife and daughter in a locked room. He grabbed his shot[]gun and ran downstairs. He locked his front door and stayed in place. [Appellant] opened up the gate to Mr. Yeager's porch and was trying to force his way in, prying the screen door open, and yelling and kicking. Mr. Yeager believed his life was in danger and told [Appellant] that he had a gun. At

- 2 -

that time, the police arrived. [Appellant] was arrested and[,] in the search incident to the arrest, Officer Ryan J. Allen recovered Steven Bennett's cell phone.

At the conclusion of the trial, this [c]ourt found [Appellant] guilty of the aforementioned charges. On March 7, 2019, [Appellant] was sentenced on Count 1, burglary, to a term of [2½] to 10 years' imprisonment; Count 2, attempted burglary, to [a 1] to 10 year term of imprisonment to run concurrent to Count 1; Count 5, robbery, to a term of [1] to 10 years' imprisonment to run concurrent to Count 1.[2]

   [2] Counts 3, 4, 5, 6, 7, 8, 14, 15, and 16 merged for sentencing purposes.

A timely post-sentence motion was filed on March 15, 2019, challenging the weight of the evidence, sufficiency of the evidence[,] and the sentence imposed on the basis that it was "excessive and unreasonable." It was denied. This timely appeal followed.

[Appellant] was directed to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b), and he did.

Trial Court Opinion, 6/14/19, at 1-3 (citations to the record and one footnote omitted). The trial court filed its Rule 1925(a) opinion on June 14, 2019.

Herein, Appellant states two issues for our review:

1. Was [the] evidence sufficient to sustain burglary and attempted burglary convictions and to specifically prove[,] beyond a reasonable doubt[,] that [Appellant] intended to commit a crime inside properties at the time he entered or attempted to enter them?

2. Did the sentencing court err by imposing costs absent evidence that [Appellant] could afford to pay them?

Appellant's Brief at vi.

Appellant first challenges the sufficiency of the evidence to sustain his convictions of burglary and attempted burglary. To begin, we note our standard of review of a challenge to the sufficiency of the evidence:

> In reviewing a sufficiency of the evidence claim, we must determine whether the evidence admitted at trial, as well as all reasonable inferences drawn therefrom, when viewed in the light most favorable to the verdict winner, are sufficient to support all elements of the offense. **Commonwealth v. Moreno**, 14 A.3d 133 (Pa. Super. 2011). Additionally, we may not reweigh the evidence or substitute our own judgment for that of the fact finder. **Commonwealth v. Hartzell**, 988 A.2d 141 (Pa. Super. 2009). The evidence may be entirely circumstantial as long as it links the accused to the crime beyond a reasonable doubt. **Moreno, supra** at 136.

**Commonwealth v. Koch**, 39 A.3d 996, 1001 (Pa. Super. 2011).

Presently, Appellant argues that the evidence at trial established that he entered the Bennett home, and tried to enter the Yeager home, because he was searching for his brother, not because he had any intent to commit a crime therein. Regarding the intent element of burglary, our Court has stated that,

> a person is guilty of a burglary if he enters an occupied structure with the intent to commit a crime therein and without license or privilege to enter. 18 Pa.C.S.[] § 3502(a). The intent to commit a crime after entry may be inferred from the circumstances surrounding the incident. **Commonwealth v. Alston**, … 651 A.2d 1092, 1094 ([Pa.] 1994). While this intent may be inferred from actions as well as words, the actions must bear a reasonable relation to the commission of a crime. **Id.** Once one has entered a private residence by criminal means, we can infer that the person intended a criminal purpose based upon the totality of the circumstances. **Id.** … at 1095. The Commonwealth is not required to allege or prove what particular crime a defendant intended to commit after his forcible entry into the private residence. **Id.**

- 4 -

*Commonwealth v. Lambert*, 795 A.2d 1010, 1022 (Pa. Super. 2002).

In this case, Appellant argues that the Commonwealth failed to prove that he intended to commit a crime when he entered the Bennett home, or attempted to enter the Yeager residence. Instead, he insists the evidence established that he "was frantically searching for his brother at the times of entry and attempted entry." Appellant's Brief at 14. To this end, Appellant stresses that

> John Bennet testified that when he opened the door, [Appellant] "ran right by me." N.T.[,] 10/12/18[,] at 12. The prosecutor asked, "What, if anything, did that person say to you?" John Bennett answered: "He was looking for his brother." *Id.* at 13.
>
> Once inside, [Appellant's] movements were not consistent with an intent to commit a crime. After running "right by" John Bennett, "[h]e went towards the bathroom. [John Bennett could not] see [Appellant] … because it is a different partition … from the rest of the house. Then [Appellant] came back out and he ran upstairs." *Id.* [] He made no effort to take anything from John Bennett when he came into the home. *Id.* at 23. At some point[, Appellant] left and re-entered the house, encountering John Bennett again. John Bennett testified that [Appellant] grabbed his shirt … and tore the bottom of his shirt. [Appellant] then pushed past John Bennett to get into the house. *Id.* at 15. Once in the house, he went down [to] the basement and out the back of the house. *Id.* [] Mr. Bennett described [Appellant] as "overwhelmed," *id.* at 17, and later as "[c]razy," *id.* at 24.
>
> On cross-examination, John Bennett read from the police statement he gave the evening of the incident, which confirmed that [Appellant] was saying "he was looking for his brother" when he entered the premises and when he was running around the house. *Id.* at 21. John Bennett once again testified that [Appellant] declared that was looking for his brother, after describing [Appellant] as "out of his mind":
>
> Q. All right. What do you mean out of his mind?

A. Oh God.  He was screaming and just running all over the place.  He wouldn't listen to me when I told him to leave the house.  He ran into other rooms.
Q. All right. Was he asking – was he looking for something?
A. He was looking for his brother.
Q. Well, how do you know that?
A. He kept on saying he was looking for his brother.
Q. All right.  And so at the time he entered your home, you would agree with me he said[, "]is my brother in here?["]
A. No.  He said, ["]where is my brother[?"]
Q. All right.  So at the time he entered the home, it is your testimony that he said, ["]where is my brother,["] correct?
A. He ran inside.  I told him to leave and he said, ["]where is my brother[?"]

*Id.* at 23–24.

Mr. Yeager also testified that [Appellant] was looking for his brother.  He testified that [Appellant] "kept on saying that they killed Isabella and that he was -- I believe he was looking for his brother."  *Id.* at 38.  Mr. Yeager also testified that [Appellant] made statements that he was looking for his brother when at his front door: "He kept on saying[, ']stop playing, where is my brother[?'"]  *Id.* at 40.

Officer Allen, who arrived on the scene, testified: "I heard him yell to me, [']let me into the house['], [I'm] looking for [my] brother."  *Id.* at 48–49.  All of that evidence is consistent with [Appellant's] own testimony that he "didn't even think about anything else but my brother at the time."  *Id.* at 121.

Appellant's Brief at 14-16.

Appellant also argues that his act of taking Steven Bennett's cell phone once inside the home cannot suffice to establish the intent element of burglary, as "[t]he accused's intent to commit a crime inside the structure must be contemporaneous with the actual or attempted entry."  *Id.* at 16 (citing *Commonwealth v. Russell*, 460 A.2d 316, 321 (Pa. Super. 1983) ("In order to be convicted of burglary, the defendant must have formed the intent to commit a crime when he entered the victim's residence, not after he

entered it. The entry must be contemporaneous with the intent to commit a crime therein.")). Appellant insists that he "did not develop any intent to take a phone until witnessing Steven with the cell phone in his hand, at which point he grabbed it to prevent the call. … Once [Appellant] achieved his immediate goal of preventing the cell phone call, he did not attack or further interact with Steven." *Id.* at 17.

Appellant further maintains that his "relevant actions do not bear reasonable relation to the commission of a crime." *Id.* at 19. For example, he stresses that he "took no measure to conceal his identity" but, instead,

> he parked his car in the driveway and went right up to the front door. Upon entry, he did not seek out valuables. Steven Bennett's testimony that [Appellant] said[,] "no you don't[,]" when grabbing the cell phone is [a] clear indication that the cell phone was taken spontaneously in order to prevent [Steven] from placing a call, not as a premeditated act of theft. There is no evidence that [Appellant] entered the house with an intent to take a cell phone or any other property.

*Id.* In sum, Appellant insists that the lack of evidence that he intended to commit any crime inside the Bennett or Yeager residences, coupled with the witness testimony that he repeatedly stated he was looking for his brother throughout the incident, requires reversal of his burglary and attempted burglary convictions.

In rejecting Appellant's sufficiency challenge, the trial court reasoned as follows:

> Here the totality of the evidence demonstrated the specific intent required to convict [Appellant] of burglary. [Appellant] aggressively tried to break in the door at 310 East Moreland Avenue. [Appellant] forcefully tried to gain entry to the Bennett

home, and when he was able to gain entry, [Appellant] ran in and around the home, despite Mr. [] Bennett['s] telling him to leave. When [Steven] Bennett tried to call police on his cell phone, [Appellant] forcefully took it from him. Additionally, when [Appellant] tried to re-enter the Bennett home, he roughed up Mr. [] Bennett and pushed him to the ground in order to do so. Based upon the totality of the circumstances, and viewing the evidence in the light most favorable to the Commonwealth as verdict winner, this [c]ourt concludes that there was sufficient evidence showing Appellant intended to commit a crime before entering the Bennett residence. Accordingly, this issue fails.

TCO at 6.

In agreeing with the trial court, the Commonwealth relies on **Lambert**. There, Lambert's co-defendant had forcibly entered his girlfriend's house by shattering a wooden door. **Lambert**, 795 A.2d at 1013. Upon finding his girlfriend inside the home with another man named Shaheed, the co-defendant and Shaheed got into an altercation. **Id.** Before the co-defendant left the home, his girlfriend's mother took money from the co-defendant's pocket to pay for the door. **Id.** As the co-defendant was leaving the residence, he stated he would be back to "get" Shaheed. **Id.** He then returned 15 minutes later with Lambert, who stayed in the car while the co-defendant again entered his girlfriend's home, this time shooting both her and her mother before fleeing in a car driven by Lambert. **Id.** at 1013-14. On appeal, we upheld Lambert's conviction for conspiracy to commit burglary, stating:

[A]s discussed in more detail above, the record reflects [the c]o–[d]efendant forcibly "entered" into a private occupied structure, [his girlfriend's] residence, without license or privilege and through force strong enough to shatter the door and its frame into wood shards. These actions permit the inference that [the c]o–[d]efendant intended a criminal purpose. As co-conspirator, [Lambert] was responsible for the actions of [the c]o–[d]efendant

taken in furtherance of the conspiracy, *i.e.*, the burglary. Thus, the evidence was sufficient for a jury to convict [Lambert] of burglary.

*Id.* at 1022 (citations omitted).

In this case, the Commonwealth makes no effort to compare the facts of *Lambert* to the present circumstances. Instead, it merely quotes the above-stated language from *Lambert*, and then declares that "the trial court was entitled to infer criminal intent from the totality of the circumstances." Commonwealth's Brief at 10. This cursory argument does not establish that *Lambert* applies, as the facts of that case are clearly distinguishable from the present case. Notably, Appellant did not actually break through the door of either the Bennett or Yeager home; instead, John Bennett opened the door and Appellant entered, and Appellant never entered the Yeager home at all. Moreover, unlike in *Lambert*, Appellant did not know the individuals living in either residence, and nothing had occurred before the incident to indicate that Appellant had a criminal intent in entering, or attempting to enter, their homes.

More importantly, to the extent that *Lambert* holds that an inference of criminal intent attaches when an individual breaks into a residence, nothing in our decision in *Lambert* suggests that such an inference is irrebuttable. In the case at hand, John Bennett testified that as soon as he opened the door, Appellant stated that "[h]e was looking for his brother." N.T. at 13. Appellant's actions inside the home further support that he entered to look for his brother, as he proceeded to run around the house as if searching for

someone.  ***See id.***  Mr. Yeager also testified that, as Appellant was trying to get into his home, Appellant was repeatedly saying, "stop playing, where is my brother."  ***Id.*** at 40.

We conclude that the totality of this evidence distinguishes the instant case from ***Lambert***, and rebuts any inference of criminal intent that arose from Appellant's trying to break through the doors of the Bennett and Yeager homes.  Appellant's statements throughout the incident, and his conduct once inside the Bennett residence, support that he was searching for his brother.  Moreover, we agree with Appellant that his impulsive act of grabbing the phone from Steven Bennett inside the home did not establish that he went into the residence for the purpose of taking the phone.  Likewise, Appellant's altercation with John Bennett outside the front door of the house did not establish that Appellant intended to commit a crime when he entered the Bennett home a second time, where Mr. Bennett testified that Appellant merely ran "downstairs and out the back…."  ***Id.*** at 14, 15.  Accordingly, we conclude that the evidence was insufficient to show that Appellant entered, or attempted to enter, the Bennett or Yeager homes to commit a crime therein.  Instead, he did so because he irrationally believed that his brother might be found inside.  Accordingly, we reverse Appellant's burglary and attempted burglary convictions.

Next, Appellant argues that the sentencing court erred by imposing costs without taking into account his ability to pay.  Appellant contends that Pennsylvania Rule of Criminal Procedure 706 mandates consideration of the

defendant's ability to pay by stating, "The court, in determining the amount and method of payment of a fine or costs shall, insofar as is just and practicable, consider the burden upon the defendant by reason of the defendant's financial means, including the defendant's ability to make restitution or reparations." Pa.R.Crim.P. 706(C). Because the court failed to take his ability to pay into consideration before imposing mandatory costs, Appellant maintains that his sentence is illegal and must be vacated.

We do not reach the merits of Appellant's sentencing issue. Our disposition reversing his burglary and attempted burglary convictions clearly upsets the trial court's overall sentencing scheme and, thus, we must remand for resentencing. *See Commonwealth v. Thur*, 906 A.2d 552, 569-70 (Pa. Super. 2006) (stating that if our disposition upsets the overall sentencing scheme of the trial court, we must remand so that the court can restructure its sentence plan).[2]

Burglary and attempted burglary convictions reversed. Judgment of sentence vacated. Case remanded for resentencing on remaining convictions. Jurisdiction relinquished.

Judge Pellegrini joins this memorandum.

Judge McLaughlin concurs in the result.

---

[2] We observe, however, that this Court recently rejected the same sentencing challenge that Appellant raises herein. *See Lopez*, 243 A.3d at 590 ("[W]hile a trial court has the discretion to hold an ability-to-pay hearing at sentencing, Rule 706(C) only requires the court to hold such a hearing when a defendant faces incarceration for failure to pay court costs previously imposed on him.").

- 11 -

*Judgment Entered.*

*Joseph D. Seletyn, Esq.*
*Prothonotary*

*Date: 9/1/2021*